Richard S. Busch (SBN 319881)
E-Mail: *rbusch@kingballow.com*
**KING & BALLOW**
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (424) 253-1255
Facsimile: (888) 688-0482
*Attorney for Plaintiff*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NICK DI PAOLO, *an individual, and on behalf of Acid Tongue Inc., a corporation*<br><br>　　　　　　Plaintiff,<br><br>vs.<br><br>PANDORA MEDIA, LLC, *a limited liability company*<br><br>　　　　　　Defendant. | Case Number: 2:22-cv-1345<br><br>**COMPLAINT FOR COPYRIGHT INFRINGEMENT**<br><br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff NICK DI PAOLO, individually and on behalf of ACID TONGUE, INC., by and through his attorneys of record, alleges as follows:

## JURISDICTION

1.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 as the action arises under the original and exclusive jurisdiction of the federal court and 28 U.S.C. § 1338(a) as the controversy arises under the Copyright Act of 1976 (17 U.S.C. § 101 *et seq.*).

2.     This Court has personal jurisdiction over Defendant as discussed fully below.

3.      This Court has general personal jurisdiction over Pandora Media, LLC ("Pandora") because Pandora's principal place of business is in Oakland, California, while also having a substantial office in Santa Monica, California, meaning that Pandora is at home in the State of California. Furthermore:

    a.  Upon information and belief, through January 28, 2022, Pandora was qualified to do business in California and was registered as a foreign corporation with the California Secretary of State.

    b.  Pandora is also registered as a foreign limited liability company with the California Secretary of State.

    c.  Pandora's designated DMCA Copyright Agent identified in its "Intellectual Property Policy" on its website is located in California at 2100 Franklin Street, 7th Floor, Oakland, California 94612.

    d.  Pandora has previously admitted in other federal court filings that California has jurisdiction over it. *See* , <u>Wixen Music Publishing, Inc. v. Pandora Media, Inc.</u>, Case No. 2:19-cv-5278-SVW (C.D. Cal.), Dkt. 15 (Pandora Media, Inc.'s Answer) at ¶¶ 16-17 ("Pandora admits that [it] has availed itself of California law . . . and venue is proper in the [Central District of California]").

4.      This Court has specific personal jurisdiction over Pandora because its suit-related conduct creates a substantial connection with the State of California and this Judicial District. NICK DI PAOLO, individually and on behalf of ACID TONGUE INC., (hereinafter "Di Paolo") is a copyright owner of properly registered literary works (the "Works" or "Di Paolo's Works") (*see* Exhibit A). Upon information and belief, Pandora has generated substantial revenue from exploitation of the Works in California, as further discussed below:

    a.  Pandora actively and purposely does business in California, as evidenced by its (i) subscribers and users in California, which Pandora

2

actively reaches out to through, at a minimum, its website ([www.pandora.com](www.pandora.com)) and mobile app; (ii) contracts and other transactions that it has entered into in California; (iii) revenue generated from California residents and businesses in connection with its service; and (iv) advertisements that target California residents.

b. Pandora has purposefully availed itself of California law and could and did reasonably anticipate being brought into this Court because, among other reasons, Pandora (i) has been engaged and is engaged in infringing conduct within the State of California and this District, including by knowingly, intentionally, and repeatedly streaming sound recordings and the Works over the Internet to California residents via its services; (ii) knew or should have known that the harm caused by its repeated unlicensed public performance of the Works over the Internet was aimed at comedy writers and comedy publishers, including Plaintiff, who control the Works and are managed and administered in or near Los Angeles County, California, a global hub of the entertainment industry; and (iii) knew or should have known that Plaintiff, an industry leading comedian, actor and comedy writer for nearly 40 years, would suffer, and in fact did suffer, the brunt of the harm caused by Pandora's unauthorized acts in California and around the world.

## **VENUE**

5.    Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b), and § 1400(a), as a substantial part of the events or omissions giving rise to the claim occurred in this district, including for example, by the maintenance of Pandora's corporate office in Santa Monica, California. Plaintiff has its principal

COMPLAINT FOR COPYRIGHT INFRINGEMENT

place of business in this District and has been injured in this District as a result of Pandora's infringing conduct.

## PARTIES

6. Plaintiff, NICK DI PAOLO, individually and on behalf of ACID TONGUE, INC., owns the intellectual property rights of Nick Di Paolo, who is an actor and comedian and resides in Georgia.

7. Defendant, Pandora, is a limited liability company with a principal place of business at 2100 Franklin Street, Suite 700, Oakland, California 94612. According to its website, Pandora maintains another corporate office in California, located at 3000 Ocean Park Boulevard, Suite 3050, Santa Monica, California 90405.

## PRELIMINARY STATEMENT

8. Just like with music, there are two copyrights involved in the recorded performance of a literary copyrighted work: a copyright in the sound recording, and a separate copyright in the underlying spoken word composition (Di Paolo's compositions, as noted, are referred to herein as "the Works" or "Di Paolo's Works"). Pursuant to 17 U.S.C. §§ 106 and 204 of the Copyright Act of 1976, copyright owners have the exclusive right to, among other things, reproduce, distribute, license, and publicly perform their works. Anyone wishing to obtain the right to do so, must get a license from the respective copyright owner in both of these copyrights, and pay agreed to royalties. The failure to do so constitutes copyright infringement. As discussed below, Pandora not only did not obtain any copyright in Di Paolo's Works but admitted that it did not do so in SEC filings, and admitted that it would very likely face copyright infringement liability as a result. But Pandora did what most goliaths do: it decided it would infringe now to ensure it had this very valuable intellectual property on its platform to remain competitive, and deal with the consequences later. Later is now.

COMPLAINT FOR COPYRIGHT INFRINGEMENT

## STATEMENT OF FACTS

9.     Laughter transcends all languages, backgrounds, and ideologies. From stories passed down in the oral tradition to online videos in present day, jokes and funny stories have carried the weight of an otherwise heavy world since time began. Comedians serve a crucial role in our society; they give others relief and allow them to laugh at any circumstance or situation without feeling guilty about it.

10.     Born in Danvers, Massachusetts, it is only fitting that Nick Di Paolo's thirty-five (35) year career as a comedian started at an open mic night at Stitches club in Boston. As a fan of stand-up comedy, he was influenced most by comedians who appeared on various television shows, including Johnny Carson, David Letterman, Jay Leno, and Robert Klein.

11.     Di Paolo's observational comedy, news satire, and political humor have made him a favorite of millions around the world. After the success of his first stand-up album, *Born This Way*, comedian Chris Rock offered Di Paolo a writing position on *The Chris Rock Show*, completing two (2) seasons, as well as writing for the 77th Annual Academy Awards, and was twice nominated for an Emmy Award for Outstanding Writing for Variety, Music, or Comedy Program.

12.     Di Paolo went on to make appearances on various television and radio shows including the *Late Show with David Letterman, The Howard Stern Show, The Tonight Show with Jay Leno,* and *Jimmy Kimmel Live.* However, Di Paolo's most iconic appearances include his regular appearances on Comedy Central's *Tough Crowd with Colin Quinn* and *The Comedy Central Roasts* including Pamela Anderson, Denis Leary, Jeff Foxworthy and Larry the Cable Guy. Di Paolo's strong political opinions and razor-sharp wit made him the perfect fit across the board.

13.     Di Paolo is not one to shy away from controversy, or water down his comedy. He prides himself on being brutally honest in a funny, socially relevant and a little bit reckless way. And his fans love him for it—so it's no surprise that

5

Di Paolo has had three (3) standup specials on Comedy Central, a Showtime Special called *Raw Nerve*, a self-released special *Another Senseless Killing*, and true to form his most controversial release *A Breath of Fresh Air.*

14.   However, Di Paolo is more than a comedian, radio host and writer, he's also an accomplished actor, appearing on FX's *Louie, Inside Amy Schumer,* HBO's *The Sopranos, Cop Show,* and CK's critically acclaimed *Horace and Pete*. Additionally, Di Paolo has enjoyed major success as a national radio host such as the *Nick Di Paolo Show* on 92.3 FM in Manhattan, New York, and *The Nick and Arti Show* on DirectTV. No matter the medium, Di Paolo's quick wit and infectious personality shines through and keeps his fans wanting more.

15.   Di Paolo has brought comedic relief to millions of people over his career, but most notably, some of his most meaningful performances were during his three (3) United Service Organizations' Tours (USO Tours) in Japan, Guantanamo Bay, Cuba, and in Afghanistan as part of Operation Mirth.

16.   Yet, industry giants, such as the Defendant, took and exploited his works solely to make themselves money while knowing it had no license and had not paid, and would not be paying, royalties to Nick Di Paolo.

17.   According to www.pandora.com, Pandora is the largest digital broadcast and streaming music provider in the U.S. "providing a highly-personalized listening experience to approximately 70 million listeners and users each month" through "its mobile app, the web, and integrations with more than 2,000 connected products."

18.   One would think that entertainment giants like Pandora would honor the legacy of such an amazing talent, but instead it chose to illegally profit from the creative mind and literary/comedic works of Nick Di Paolo.

19.   In fact, Defendant has made one hundred and forty-two (142) of his works (the "Works") available for dissemination to the public via their digital

6

broadcast radio service knowing full well that it did not possess a valid license to publicly perform the Works. (*See* Exhibit A).  In addition to no license, it also made no royalty payments for the Works. The Works are contained on the albums, "Born This Way", "Road Rage", "Funny How?", "Raw Nerve", "Another Senseless Killing", and "A Breath of Fresh Air". Plaintiff has duly complied with all required provisions of the copyright laws of the United States applicable to the Works, including but not limited to, registering copyrights in and to said Works with the United States Copyright Office (*see* Exhibit A for applicable copyright registration numbers) on or about June 1, 1998, August 23, 2004, January 15, 2009, February 8, 2013, February 2, 2015, and October 27, 2021.[1]

20.    Further, it is required by law, and fully understood, that digital service providers, like Pandora, must also get a mechanical digital reproduction license from the owner of the underlying composition in order to make the underlying composition of a recording available for reproduction and distribution through interactive streaming. This is true even where the digital service provider has a license to interactively stream a sound recording. Pandora made one-hundred and forty-two (142) of these Works available via its Pandora Premium interactive streaming service, also knowing full well that it did not possess a valid license to not only publicly perform his works but also no license to distribute and reproduce the Works. Pandora made no royalty payments for the public performance and no royalty payments for the reproduction of the Works. The end result is Pandora took Di Paolo's Works, gained listeners, subscribers and market share with full knowledge it did not have licenses and made no royalty payments for the Works,

---

[1] Including three (3) standalone Works: "Old People", "Doggy Hotel", and "Hair In Food" registered with the Copyright Office on February 21, 1995.

COMPLAINT FOR COPYRIGHT INFRINGEMENT

to increase its stock price helping them to reorganize the company with Sirius XM (although the two companies remain to this day completely separate corporations) for billions all while depriving Nick Di Paolo from his hard-earned royalties.

21. As of February 17, 2022, www.pandora.com advertised that Nick Di Paolo had 9,100 monthly listeners. If each listener listened to only one (1) available work per month, that's 109,200 broadcasts or/interactive streams per year at a minimum. Unfortunately, Di Paolo has not received a fraction of a penny for any of these broadcasts or streams of the Works from Pandora.

22. For years therefore Pandora has illegally made reproductions and digital broadcasts on its servers and provided streaming access to its users without a proper public performance license and, when applicable, a reproduction right license. This infringement continues on a daily basis as the Works are broadcast on Pandora radio and/or remain available for interactive streaming on Pandora Premium.

23. While it is commonplace in the music industry for companies like Pandora to enter into public performance licensing agreements with performance rights organizations like BMI and ASCAP for musical compositions, these entities do not license literary works. Therefore, it was the responsibility of Pandora to seek out the copyright owners and obtain valid public performance licenses.

24. Pandora only needed to contact one entity, Di Paolo, to obtain the required licenses. Or Pandora could have chosen not to use Di Paolo's Works, particularly since it knew it did not have the required licenses. Instead, it chose to infringe.

25. Di Paolo, over the course of his career entered into numerous agreements for the creation/distribution of sound recordings and television specials.

26. Di Paolo, however, retained all of his exclusive rights in the Works. Digital Service Providers, like Pandora, had to come to Di Paolo to secure the

8

necessary licenses for exploitation of the Works, and they knew it—but they did not.

27.     Pandora's failure to obtain the necessary licenses for the Works or pay royalties, but to nonetheless infringe by exploiting the Works, has been willful. In Pandora's own SEC 10K public filing with the Security and Exchange Commission from 2011 to 2017, three quarters of a decade, Pandora admitted in its Risk Factors ever year that it performs spoken-word comedy content "absent a specific license from any [] performing rights organization" and it has never obtained a license for the underlying literary works for the sound recordings of spoken-word comedy content that it streams. Pandora further admitted that it "could be subject to significant liability for copyright infringement and may no longer be able to operate under [their] existing licensing regime." This admission was only removed, not so coincidentally, after Pandora's transaction with Sirius XM Radio.

28.     Not only did Pandora admit to the federal government that it willfully broadcast and streamed spoken-word comedy content without a specific license, Pandora also shamelessly advertised its "newfound" comedy stations to the public and generated revenue from advertising sales. In 2011, major news outlets such as *CNN* and *The New York Times* reported that "[Pandora has] taken the same approach to comedy as [they] have to music: carefully and deliberately analyzing comedic 'bits' across a very large number of attributes to capture the style, delivery and content of each performance."[2]—there is just one glaring omission, they failed to obtain a public performance license.

_____

[2] Ben Parr, Pandora adds 10,000 comedy clips to its archives CNN (2011), http://www.cnn.com/2011/TECH/web/05/04/pandora.comedy.mashable/index.html (last visited Feb 25, 2022).

COMPLAINT FOR COPYRIGHT INFRINGEMENT

29.     Pandora nonetheless did not even take the simplest of steps to ask Di Paolo or his representatives for licenses for the Works. To the contrary, beginning in or about August of 2020, Word Collections ("WC"), a Spoken Word/Literary Works Collection Agency contacted Pandora in an effort to negotiate a licensing agreement for various copyright owners. From that initial contact and on an ongoing basis over the course of the following year, WC made numerous efforts on behalf of WC's other spoken word/literary works clients, to engage Pandora in good faith negotiations, to no avail.

30.     However, what is notable is that in February 2011, *CNNMoney* reported that Pandora wasn't "yet profitable,"[3] posting "a net loss of $328,000 on revenue of $90.1 million in the first nine months of its most recent fiscal year." Its biggest expense— "royalties it pays for the music it streams. As Pandora's audience grows, so do those costs, which reached $45.4 million in the first nine months of 2010."

31.     The timing is significant, following Pandora's reported net losses, the astronomical amount of costs incurred for music streams, and its intention to raise $100 million in an initial public offering, Pandora announced in May of 2011 that it was adding comedy to its list of offerings and that those stations would include audio advertisements, touting Unilever as their first major advertiser—promoting its Axe body spray and Klondike bars.[4] Thereby generating additional advertising

---

[3] Stacy Cowley, Pandora files for $100 million IPO CNNMoney (2011), https://money.cnn.com/2011/02/11/technology/pandora_ipo/index.htm (last visited Feb 25, 2022).

[4] Ben Parr, Pandora adds 10,000 comedy clips to its archives CNN (2011), http://www.cnn.com/2011/TECH/web/05/04/pandora.comedy.mashable/index.html (last visited Feb 25, 2022).

revenue for the company while excluding comedians like Nick Di Paolo and many others from their hard earned royalties and licensing fees. Pandora found a cash cow in a new revenue stream, and in a brazen business decision determined that the risk was worth the gain—that is until now.

32.    While Pandora's counsel wrote on September 14, 2021 to advise that counsel would respond with Pandora's position about unlicensed spoken word content appearing on Pandora's platform, no substantive response from Pandora or its counsel has been sent or received.

33.    The bottom line is that Pandora's actions were willful and they knew they had their hand in the cookie jar and would eventually get caught—it was just a matter of when. Di Paolo would likely give the following advice to Pandora from his dad: "[comedy] is like pizza, even when it's bad you still gotta pay for it." – the only difference is, Di Paolo's comedy isn't bad, which means it's worth even more.

## CAUSE OF ACTION

### (Copyright Infringement – 17 U.S.C. § 501)

34.    Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

35.    Plaintiff is the legal and beneficial owner of the United States copyrights in the Works, duly registered with the United States Copyright Office, (See Exhibit A), as discussed above.

36.    Defendant has directly, vicariously, and/or contributorily infringed and/or induced infringement of Plaintiff's copyright in violation of 17 U.S.C. § 501.

37.    Defendant has publicly performed, broadcasted, and provided its listeners/users of the Works, as discussed hereinabove.

38.    Defendant's acts were performed without authorization, license, or consent. Defendant's unauthorized and unlicensed reproduction, distribution,

public performance and display of the Works infringes Plaintiff's exclusive rights in violation of the Copyright Act, 17 U.S.C. § 106 *et. seq.*

39.     Defendant's infringement has been and continues to be, willful, intentional, purposeful, and with complete disregard to Plaintiff's rights.

40.     As a direct and proximate result of Defendant's infringement, Plaintiff has been irreparably harmed.

41.     Defendant has infringed Plaintiff's copyright interest in the Works by making reproductions and digital broadcasts on its servers and provided streaming access to its users without a proper public performance and, when applicable, reproduction rights license.

42.     Plaintiff has received no royalties or payments for the Works embodied in the sound recording of the underlying literary compositions.

43.     Defendant has continued to market, exploit, reproduce, distribute, and publicly perform the Works through this day, which violates Plaintiff's copyrights and are at issue in this lawsuit.

44.     Defendants had knowledge and have admitted that it did not and does not possess a valid public performance license for the Works at issue, and with that knowledge of infringement, continued to infringe upon Plaintiff's copyrights.

45.     The infringement is continuing as the Works continue to be exploited, performed, broadcast, and streamed across Defendant's applicable platforms, and/or their agents.

46.     As a direct and proximate result of Defendant's infringement, pursuant to 17 U.S.C. § 504(a)(1) and (b), Plaintiff is entitled to actual damages in addition to Defendant's profits both domestically and relating to foreign sales of other exploitation of the Works that were distributed, performed, broadcast, or otherwise infringed domestically. Further, Plaintiff is entitled to a running royalty

on all future exploitations of the Works following judgement in an amount to be determined.

47.     In the alternative to profits and actual damages, pursuant to 17 U.S.C. § 504(c), Plaintiff is entitled to the maximum amount of statutory damages, $150,000 per copyrighted work for each act of copyright infringement, for a total of $21,300,000 ($150,000 times 142 registered Works).

48.     As a direct and proximate result of Defendant's infringement, Plaintiff has incurred attorneys' fees and costs which are recoverable pursuant to 17 U.S.C. § 505.

49.     Defendant's conduct has caused, is continuing to cause, and will further cause great damage to Plaintiff, which damages cannot be accurately measured in monetary terms, and therefore, unless enjoined by the Court, Plaintiff will suffer irreparable injury, for which Plaintiff is without adequate remedy at all. Accordingly, Plaintiff is entitled to a permanent injunction pursuant to 17 U.S.C. § 502 following judgment, prohibiting further infringement, reproduction, distribution, sale public performance, other use, or exploitation of Plaintiff's copyright without a proper license.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment and relief, as follows:

50.     For Judgment in favor of Plaintiff and against Defendant.

51.     For a declaration and finding that Defendant has willfully infringed Plaintiff's copyrighted work in violation of the Copyright Act;

52.     For declaration and finding that Defendant is directly, vicariously, and/or contributorily liable for copyright infringement pursuant to 17 U.S.C. § 504(a)(1) and (b), including a finding that Defendant is liable for actual damages, as well as for Defendant's profits;

COMPLAINT FOR COPYRIGHT INFRINGEMENT

53.   For an accounting of all profits, income, receipts, or other benefits derived by Defendant from the production, copying, display, promotion, distribution, broadcast, public performance, or sale of products and services or other media, either now known or hereafter devised, that improperly or unlawfully infringe Plaintiff's copyright pursuant to 17 U.S.C. § 504(a)(1) and (b);

54.   For statutory damages, upon election prior to final judgment in the alternative to actual damages and profits, for willful copyright infringement pursuant to 17 U.S.C. § 504(c);

55.   For costs of suit herein, including an award of attorneys' fees pursuant to 17 U.S.C. § 505;

56.   For pre-judgment and post-judgment interest;

57.   For a running royalty and/or ownership share in the Infringing Work following judgment in an amount to be proven at trial, or in the alternative, for the entry of an injunction requiring Defendants, their officers, agents, servants, employees, representatives, successors, licensees, partners, attorneys, and assigns, and all persons acting in concert or participation with each or any one of them to be permanently enjoined from directly or indirectly infringing, reproducing, displaying, promoting, advertising, distributing, or selling any work that infringes, contributorily infringes, or vicariously infringes Plaintiff's rights in the work protected by the Copyright Act;

58.   For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), and otherwise, Plaintiff respectfully demands a jury trial on all issues raised in this complaint.

PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 38(b), AND OTHERWISE, PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES RAISED IN THIS COMPLAINT.

Dated: February 28, 2022         Respectfully submitted,

By: /s/ Richard S. Busch
Richard S. Busch
Attorney for Plaintiff

COMPLAINT FOR COPYRIGHT INFRINGEMENT